IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LEAH K. HENDERSON,           )
                             )
          Plaintiff,         )
                             )
     vs.                     )  Civil Action No. 11-955
                             )
MICHAEL J. ASTRUE,           )
COMMISSIONER OF SOCIAL       )
SECURITY,                    )
                             )
          Defendant.         )

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiff, Leah K. Henderson, seeks judicial review of a
decision of Defendant, Michael J. Astrue, Commissioner of Social
Security ("the Commissioner"), denying her application for
supplemental security income ("SSI") under Title XVI of the
Social Security Act, 42 U.S.C. §§ 1381-1383f.[1]  Presently before
the Court are the parties' cross-motions for summary judgment
pursuant to Fed.R.Civ.P. 56.  For the reasons set forth below,
Plaintiff's motion for summary judgment will be granted to the
extent she seeks a remand of this case for further proceedings,

---

[1] The Social Security system provides two types of benefits based on an
inability to engage in substantial gainful activity: the first type, DIB,
provides benefits to disabled individuals who have paid into the Social
Security system through past employment, and the second type, SSI, provides
benefits to disabled individuals who meet low-income requirements regardless
of whether the individuals have ever worked or paid into the Social Security
system.

1

and the Commissioner's cross-motion for summary judgment will be denied.

**PROCEDURAL HISTORY**

Plaintiff filed an application for SSI on April 25, 2007, alleging disability since February 1, 2003 due to bipolar disorder, depression, panic attacks, post-traumatic stress disorder, migraine headaches and lupus.[2] (R. 209, 245). Following the denial of Plaintiff's SSI application on December 14, 2007, she requested a hearing before an Administrative Law Judge ("ALJ"). (R. 132, 153). Plaintiff, who was represented by counsel, testified at the hearing which was held on July 22, 2009. A vocational expert ("VE") also testified. (R. 99-130).

On September 23, 2009, ALJ Alma Deleon issued a decision denying Plaintiff's application for SSI based on a determination that, despite severe impairments of bipolar disorder and myalgia, Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[3] (R. 136-42). Plaintiff's request for review of ALJ Deleon's decision, which was filed on October 8, 2009, was granted. On May 26, 2010, the Appeals Council vacated ALJ

---

[2] Although Plaintiff claims she has been disabled and unable to engage in substantial gainful activity since February 1, 2003, SSI is not payable prior to the month following the month in which a claimant files an application. See 20 C.F.R. § 416.335.

[3] The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. See 20 C.F.R. § 416.945(a).

2

Deleon's decision and remanded the case for further proceedings

on the following grounds:

> (1) the hypothetical question posed to the VE by ALJ
> Deleon was not consistent with the assessment of
> Plaintiff's RFC in her hearing decision;

> (2) the VE's failure to identify specific occupations
> that Plaintiff could perform (rather than generic
> occupational classifications) precluded a meaningful
> comparison of the VE's testimony to the Dictionary of
> Occupational Titles;

> (3) ALJ Deleon utilized the wrong Medical-Vocational Rule
> as a framework for her decision-making; and

> (4) ALJ Deleon did not comply with the requirements of
> Social Security Ruling ("SSR") 96-7p in assessing the
> credibility of Plaintiff's statements regarding her
> symptoms and their effect on her ability to engage in
> substantial gainful activity.[4]

(R. 143-46, 164-65).

Plaintiff's disability hearing following remand was held on

October 27, 2010 before ALJ George A. Mills, III. Plaintiff,

who was represented by counsel, and another VE testified at the

hearing. (R. 52-98). On December 23, 2010, ALJ Mills issued a

decision denying Plaintiff's application for SSI based on his

conclusion that Plaintiff was capable of performing past

---

[4] SSRs are agency rulings published "under the authority of the Commissioner of
Social Security" and "are binding on all components of the Social Security
Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000). SSR 96-7p
clarifies when an ALJ's evaluation of a claimant's symptoms, including pain,
requires a finding concerning the credibility of the claimant's statements
about symptoms and their functional effects; explains the factors to be
considered by the ALJ in assessing the credibility of a claimant's statements
about symptoms; and notes the importance of the ALJ providing an explanation
of the reasons for the finding about the credibility of a claimant's
statements in the disability decision.

relevant work. (R. 9-25). Plaintiff filed a request for review of ALJ Mills' adverse decision; however, the request was denied by the Appeals Council on May 20, 2011. (R. 3-5). Thus, ALJ Mills' decision became the final decision of the Commissioner. This appeal followed.

### BACKGROUND

Plaintiff's testimony during the hearing before ALJ Mills on remand by the Appeals Council may be summarized as follows:

Plaintiff was born on March 24, 1972.[5] (R. 60). With regard to education, Plaintiff graduated from high school in 1992. Subsequently, she received a degree from The International Culinary Academy and a certificate in massage therapy from Community College of Allegheny County. (R. 63).

In the past, Plaintiff has been employed by a retail clothing store (holiday season 2001-2002); a telephone customer service representative for a bank for three months in the summer of 2001; a cashier/attendant for a convenience store (1999-2000); and a delicatessen clerk in a grocery store (1997). (R. 67-69, 246).

In 2007, following the development of numbness in Plaintiff's hands and feet which eventually evolved into paralysis, she was diagnosed with a Chiari malformation, a birth

---

[5] Plaintiff was 35 years old at the time her application for SSI was filed.

4

defect.[6]  Corrective surgery was performed in November 2008.  The
surgery resolved Plaintiff's paralysis; however, she continues
to suffer from numbness in her hands and feet and pain in her
neck.  (R. 71-73, 90).

Plaintiff has suffered from migraine headaches since she
was 6 years old.  On average, Plaintiff gets migraine headaches
twice a week that incapacitate her for the entire day.[7]
Plaintiff also suffers from rheumatoid arthritis ("RA")[8] and
fibromyalgia.[9]  For these conditions, Plaintiff takes Topamax,
Maxalt and Oxycodone, which make her sleepy.[10]  She also had been

---

[6] Chiari malformations are structural defects in the cerebellum, the part of
the brain that controls balance.  When the indented bony space at the lower
rear of the skull is smaller than normal, the cerebellum and brainstem can be
pushed downward.  The resulting pressure on the cerebellum can block the flow
of cerebrospinal fluid (the liquid that surrounds and protects the brain and
spinal cord) and can cause a range of symptoms including dizziness, muscle
weakness, numbness, vision problems, headaches and problems with balance and
coordination.  www.ninds.nih.gov/disorders.

[7] Plaintiff testified that she has been hospitalized overnight for management
of the pain from her migraine headaches "a couple of times."  (R. 76).

[8] RA is a form of arthritis that causes pain, swelling, stiffness and loss of
function in your joints.  It can affect any joint but is common in the wrist
and fingers.  RA is an autoimmune disease, which means the arthritis results
from your immune system attacking your body's own tissues.  No one knows what
causes RA.  Treatments include medicine, lifestyle changes and surgery.
www.nlm.nih.gov/medlineplus.

[9] Fibromyalgia makes you feel tired and causes muscle pain and "tender points"
on the neck, shoulders, back, hips, arms or legs that hurt when touched.
People with fibromyalgia may have other symptoms, such as trouble sleeping,
morning stiffness, headaches and problems with thinking and memory, sometimes
called "fibro fog."  No one knows what causes fibromyalgia.  Anyone can get
it, but it is most common in middle-aged women.  People with RA and other
autoimmune diseases are particularly likely to develop fibromyalgia.  There
is no cure for fibromyalgia, but medicines can help manage the symptoms.
www.nlm.nih.gov/medlineplus.

[10] Topamax is used, among other reasons, to prevent migraine headaches but not
to relieve the pain of migraine headaches when they occur.  Topamax is in a
class of medications called anticonvulsants.  It works by decreasing abnormal
excitement in the brain.  Maxalt is used to treat the symptoms of migraine
headaches (severe, throbbing headaches that sometimes are accompanied by
nausea and sensitivity to sound and light).  It is in a class of medications

receiving monthly injections in her shoulders and down her spine by a pain management specialist for over a year. (R. 73-75, 77).

Plaintiff also suffers from severe depression. Dr. Steven Brown, who had been Plaintiff's primary care physician ("PCP") for 17 years at the time of the hearing before ALJ Mills, prescribed Doxepin for her depression a month before the remand hearing.[11] Plaintiff was scheduled to begin outpatient mental health treatment the week following the hearing. (R. 74-75, 78, 81-82).

With respect to physical abilities, on level ground, Plaintiff can walk 50 feet before she gets tired; she can stand for 15 minutes at a time and sit for 15 to 20 minutes at a time; she gets lightheaded when she bends forward; she drops things due to problems with her hands and arms; and she limits lifting to objects weighing less than 5 pounds. Temperature extremes exacerbate the pain in Plaintiff's joints from the RA. (R. 79-80).

---

called selective serotonin receptor agonists. It works by narrowing blood vessels in the brain, stopping pain signals from being sent to the brain, and stopping the release of certain natural substances that cause pain, nausea and other symptoms of migraine. Maxalt does not prevent migraine attacks. Oxycodone, which can be habit-forming, is used to relieve moderate to severe pain. Oxycodone is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the brain and nervous system respond to pain. www.nlm.nih.gov/medlineplus/druginfo.

[11] Doxepin is used to treat depression and anxiety. It is in a class of medications called tricyclic antidepressants. It works by increasing the amounts of certain natural substances in the brain that are needed for mental balance. www.nlm.nih.gov/medlineplus/druginfo.

As to activities of daily living, Plaintiff is able to take care of her personal hygiene without assistance. With regard to cooking, Plaintiff does the prep work while her fiancé does any heavy lifting, such as putting the food in the oven. He also does the dishes. (R. 84). Plaintiff has a driver's license. However, she limits her driving to trips that are no more than 10 to 15 minutes from her home. (R. 62).

On a typical day, Plaintiff rises between 9:00 and 10:00 a.m., takes a pain pill and eats breakfast. She then takes a nap for an hour or so.[12] After her nap, Plaintiff attempts to do some chores. For example, if it is laundry day, Plaintiff's fiancé brings her a laundry basket of clean clothes to be folded. Usually, Plaintiff is able to fold a full basket of clothes before she gets tired.[13] Plaintiff also is able to do "a little bit of dusting." She cannot vacuum the carpet, however. Plaintiff and her fiancé go grocery shopping every other week. (R. 85-86).

Plaintiff was a snow skier; she rode horses and a motorcycle with her fiancé; and she participated in ballroom dancing. Since her surgery to correct the Chiari malformation, Plaintiff can no longer engage in these activities. Plaintiff

---

[12] In response to questioning by her counsel, Plaintiff testified that she sleeps a total of 3 to 4 hours during the day due to depression and the side effects of her medications. (R. 88).

[13] Regarding laundry, Plaintiff also testified that she probably would not be able to fold 2 baskets of laundry at a time or a single basket of laundry every day. (R. 89).

does accompany her fiancé when he goes fishing, but she cannot cast a rod. Plaintiff and her fiancé belong to a church and attend 45-minute services on Sundays. However, they sit in the back of the church to enable Plaintiff to stand as needed without disrupting the service. (R. 86-87).

## VE Testimony

During the remand hearing, the VE classified Plaintiff's past work as follows: retail clerk - light and unskilled;[14] telephone customer service representative - sedentary and semi-skilled; and convenience store attendant - medium and unskilled. (R. 91).

ALJ Mills asked the VE to assume a hypothetical person of Plaintiff's age, education and work experience who can perform light work with the following restrictions:[15] (1) she cannot climb ladders, ropes or scaffolding; (2) she can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; (3) she must avoid environments with temperature extremes, vibrations, fumes, dust, odors, gasses, chemicals and pollutants; and (4) she must avoid hazards such as

---

[14] As discussed *infra*, Plaintiff's testimony regarding the responsibilities and exertion level of her job with the clothing store did not support the VE's classification of the job. This fact is significant because ALJ Mills' denial of Plaintiff's application for SSI was based on his conclusion that she retained the RFC to perform this past job.

[15] The Social Security Regulations define "light work" as "lifting no more than 20 pounds at a time with frequent lifting and carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

8

working at unprotected heights and working with dangerous machinery. ALJ Mills then asked the VE whether the hypothetical person could perform any of Plaintiff's past work. In response, the VE testified that the hypothetical person could perform Plaintiff's past jobs as a retail clerk and a telephone customer service representative. (R. 91-93).

If, in addition to the limitations set forth in ALJ Mills' first hypothetical question, the hypothetical person was limited to unskilled work, the VE testified that Plaintiff's past job as a telephone customer service representative would be eliminated. However, the hypothetical person could still perform Plaintiff's past job as a retail clerk. The VE further testified that his answer would not change if, in addition, the hypothetical person was limited to work that did not involve a rapid production pace or production quotas because the job of a retail clerk does not require either. (R. 93-94).

If, in addition to all of the foregoing limitations, the hypothetical person's impairments affected her concentration, resulted in her being off task one-third of an 8-hour workday, and caused her to be absent from work more than 2 days a month, the VE testified that there would be no jobs the hypothetical person could perform. (R. 95-96).

Plaintiff's counsel asked the VE one question; that is, whether the hypothetical person could perform any job if she

also lost consciousness up to two times a month.  Again, the VE testified that there would be no jobs the hypothetical person could perform.  (R. 96).

## EVIDENCE RELATING TO PLAINTIFF'S IMPAIRMENTS[16]

On December 29, 2003, Plaintiff presented to Western Psychiatric Institute and Clinic ("WPIC") stating: "I'm depressed and want to kill myself."  Plaintiff reported that she had been feeling depressed and hearing voices and apparently became suicidal when she did not receive a response to a letter she wrote to her parents concerning sexual abuse by her uncle and others during childhood.  Plaintiff reported that she was unemployed and living with her husband and 10-year old son, and that her mother had custody of her 17-year old daughter due to accusations of child abuse.  Plaintiff was admitted to WPIC for evaluation and treatment.  At the time of discharge on January 2, 2004, Plaintiff's mood was significantly improved and she denied suicidal ideation and auditory hallucinations. Plaintiff's diagnoses included adjustment disorder with depression, psychotic disorder and rule out borderline personality disorder, as well as migraine headaches. Plaintiff's score on the Global Assessment of Functioning

---

[16] For background purposes, the Court has included evidence in its summary which significantly pre-dates the relevant time period in this case.

10

("GAF") Scale was rated a 60,[17] and her recommended treatment was medication therapy. (R. 336-42).

On July 8, 2004, an MRI of Plaintiff's brain was performed due to complaints of numbness and tingling in all extremities with blurred vision and total body pain. The MRI showed a signal abnormality on the anterolateral aspect of Plaintiff's right thalamus with no abnormal enhancement. Otherwise, the MRI was unremarkable. (R. 273).

On March 11, 2005, Plaintiff was evaluated by Dr. Leslie Tar, a rheumatologist, for fibromyalgia based on a referral by Dr. Brown, Plaintiff's PCP. Dr. Tar noted that Plaintiff was taking Baclofen and Nortriptyline and reported significant improvement.[18] Dr. Tar also noted that Plaintiff had been evaluated for complaints of aching and intermittent parasthesias of fleeting quality, and that EMG and nerve conduction tests of

---

[17] The GAF scale is used by clinicians to report an individual's overall level of functioning. The scale does not evaluate impairments caused by physical or environmental factors. The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health to mental illness. The highest possible score is 100, and the lowest is 1. A GAF score between 51 and 60 denotes: **"Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000), at 34 (bold face in original) ("DSM-IV-TR").

[18] Baclofen acts on the spinal cord nerves and decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases. It also relieves pain and improves muscle movement. The medication is sometimes prescribed for other uses. Nortriptyline is used to treat depression. Nortriptyline is in a group of medications called tricyclic antidepressants. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance. www.nlm.nih.gov/medlineplus/druginfo.

Plaintiff's extremities, as well as chemistry and rheumatology studies, had been unremarkable. Plaintiff's physical examination by Dr. Tar was normal with the exception of tender points in a localized distribution of her hips and shoulders. Dr. Tar's assessment included (1) depression; (2) migraine headaches; (3) chronic fatigue; and (4) fibromyalgia. Dr. Tar instructed Plaintiff to continue the Baclofen and Nortriptyline; to contact her psychiatrist for a refill of her Cymbalta and Topamax;[19] and to follow-up in 4 weeks. (R. 283-84).

On May 24, 2005, Plaintiff presented to the Emergency Department of Jefferson Regional Medical Center for pain control of a migraine headache. Plaintiff reported a migraine headache of two days' duration with nausea, but no vomiting. Plaintiff was treated with several medications. At the time of discharge, she was described as "much improved" and instructed to follow-up with her PCP. (R. 285-95).

On December 6, 2005, Plaintiff was seen by Dr. Brown for complaints of worsening migraine headaches and a rash on her right index finger. Dr. Brown increased Plaintiff's dosage of Topamax and prescribed medication for the rash. (R. 314-15).

---

[19] Cymbalta is used to treat depression and generalized anxiety disorder. It is also used to treat pain and tingling caused by diabetic neuropathy, fibromyalgia and ongoing bone or muscle pain such as lower back pain and osteoarthritis. Cymbalta is in a class of medications called selective serotonin reuptake inhibitors and works by increasing the amounts of serotonin and norepinephrine, natural substances in the brain that help maintain mental balance and stop the movement of pain signals in the brain. www.nlm.nih.gov/medlineplus/druginfo.

On March 31, 2006, at her request, Plaintiff was discharged from outpatient mental health treatment at FamilyLinks, Inc. because she was "doing very well and ... did not need to come in for treatment anymore."[20] Plaintiff's discharge summary listed the following diagnoses: Bipolar Disorder NOS (by history), Panic Disorder without Agoraphobia, Post Traumatic Stress Disorder (chronic) and Borderline Personality Disorder. Plaintiff was assigned a GAF score of 55 at the time of admission and a GAF score of 65 upon discharge.[21] (R. 296-303).

On March 27, 2007, Plaintiff was seen by Dr. Brown for completion of a Health-Sustaining Medication Assessment Form from the Pennsylvania Department of Public Welfare ("PA DPW Form"). In the record of the office visit, Dr. Brown noted that Plaintiff suffers from depression, bipolar disorder, fibromyalgia and migraine headaches; Plaintiff had not taken her medications during the previous year due to the loss of health insurance; Plaintiff was anxious for a refill of Topamax to stabilize her mood and control her migraine headaches; and Plaintiff thought she would be fine without a refill of her anti-depressant medication. In the PA DPW Form, Dr. Brown

---

[20] Plaintiff had been receiving outpatient medication management and individual and couples therapy at FamilyLinks, Inc. since September 2, 2003. (R. 296-300).

[21] A GAF score between 61 and 70 denotes the following: **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** DSM-IV-TR.

indicated Plaintiff needed health-sustaining medications and was disabled from employment for 6 months, i.e., from March 27, 2007 to September 27, 2007. (R. 308-10).

Plaintiff was treated by Dr. Brown on May 22, 2007 for sinusitis. A week later, Plaintiff called Dr. Brown's office for an increase in her Topamax for continuing migraine headaches. (R. 306-07).

On June 20, 2007, Plaintiff was seen by Dr. Brown for complaints of numbness in her hands and feet of several weeks' duration. Dr. Brown noted that this type of numbness is a well-known side effect of Topamax, but that Plaintiff had taken very high doses of the medication in the past without this side effect. Dr. Brown's assessment included: "1) Paresthesia lower extremities suspect secondary to Topamax. 2) Migraine headaches improved nicely. 3) Weight loss secondary to Topamax. 4) Anxiety regarding dental procedure." Plaintiff was given a prescription for blood work and anti-anxiety medication to take prior to her upcoming dental procedure. (R. 305).

Plaintiff's next follow-up visit with Dr. Brown took place on July 23, 2007. Plaintiff reported that she was "currently fairly physically active," but that she suffered from 1 or 2 migraine headaches a week with vomiting and the need to retreat to a dark room. Dr. Brown increased Plaintiff's dosage of

Topamax; prescribed lab work; and referred her for a rheumatology consult.  (R. 304).

On September 14, 2007, Plaintiff was seen by Dr. Brown for complaints of numbness in her feet.  Dr. Brown noted that previous numbness in Plaintiff's hands and feet had resolved but recurred in her lower extremities following a back injury.  Dr. Brown also noted that Plaintiff's migraine headaches were stable.  The diagnoses were lower extremity paresthesias, lumbar strain/sprain and fibromyalgia.  Dr. Brown prescribed Flexeril for Plaintiff.[22]

Plaintiff did not show for consultative psychological disability examinations scheduled with Lanny Detore, E.D.D., a counselor, on August 15, 2007, October 17, 2007 and November 14, 2007.[23]  (R. 320-22).

Between November 5, 2007 and February 5, 2008, Plaintiff was treated by Dr. Brown on three occasions for various complaints including coughing spells and hoarseness, an increase in her migraine headaches to 1 or 2 a week and a rash on her right index finger with pain radiating up her arm.  (R. 372-74).

During an office visit with Dr. Brown on April 18, 2008,

---

[22] Flexeril, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  www.nlm.nih.gov/medlineplus/druginfo.
[23] In a Psychiatric Review Technique form dated December 3, 2007, Sharon Tarter, Ph.D., indicated that an assessment of Plaintiff's mental impairments could not be performed due to insufficient evidence resulting from Plaintiff's failure to cooperate.  (R. 323-35).

Plaintiff reported numbness and weakness in her hands of one month duration which was causing her to drop things. She also reported an increase in anger. Dr. Brown diagnosed Plaintiff with anxiety and depression and prescribed Celexa for her.[24] As to the hand problems, Dr. Brown ordered tests and indicated that Plaintiff would be referred for a neurology or rheumatology consult. (R. 371).

On May 14, 2008, an electrodiagnostic evaluation of Plaintiff was performed by Dr. Mary Ann Miknevich. Plaintiff reported a 6-month history of daily, intermittent numbness in her hands and difficulty holding objects. The symptoms initially started in her left hand and progressed to her right hand and feet. EMG and nerve conduction testing of both upper extremities was "essentially unremarkable." Dr. Miknevich noted that Plaintiff's symptoms were of relatively recent onset, and recommended repeat electrical testing at a future date if the symptoms increased in intensity or frequency. (R. 367-70).

During Plaintiff's next office visit with Dr. Brown on June 6, 2008, she reported numbness in her legs and feet, excessive sleepiness and a dry cough. Dr. Brown ordered an MRI of Plaintiff's cervical spine. (R. 366).

---

[24] Celexa is used to treat depression. It is in a class of antidepressants called selective serotonin reuptake inhibitors. It is thought to work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. www.nlm.nih.gov/medlineplus/druginfo.

In a medical record dated October 9, 2008, Dr. Brown noted that Plaintiff's severe migraine headaches were controlled with a high dose of Topamax and the occasional use of Maxalt; Plaintiff's bipolar disorder was treated with Celexa; Flexeril was prescribed for Plaintiff's fibromyalgia and she was being followed by a rheumatologist; a recent MRI revealed that Plaintiff had a Chiari malformation; a neurologist who evaluated Plaintiff did not believe the Chiari malformation was causing any issues and recommended that treatment be limited to Plaintiff's migraine headaches; since the neurology consultation, Plaintiff had developed a new symptom of intermittent occipital stabbing pain that occasionally extended to the temporal area lasting a few minutes to an hour; the new pain was entirely different from the pain Plaintiff experienced during a migraine headache; and Plaintiff's fiancé had witnessed several brief episodes of syncope (fainting). Based on the foregoing, Dr. Brown indicated that Plaintiff would be referred for a neurosurgical evaluation as soon as possible. (R. 365).

On October 29, 2008, Plaintiff was evaluated by Dr. David Kaufmann, a neurosurgeon, in connection with her 6-month history of neck pain, headaches and intermittent numbness and tingling in her upper and lower extremities. Plaintiff reported that her present neck pain and headaches, which she described as "severe, stabbing pain in the occipitocervical area ... that tends to

come on spontaneously," were "quite distinct" from the migraine headaches she suffered from since childhood. She also reported associated feelings of numbness and tingling running down her arms and legs, hand weakness and alterations in consciousness, gait and balance. The pain, which could occur several times a day, lasted from 45 seconds to 10 minutes and was significantly affecting Plaintiff's daily activities and quality of life. Dr. Kaufman noted that a recent MRI of Plaintiff's cervical spine showed evidence of a Chiari malformation, and he recommended surgical intervention. (R. 357-59).

Plaintiff was admitted to UPMC Mercy Hospital on November 18, 2008 for a suboccipital decompressive craniotomy and patch for the Chiari malformation. She was discharged on November 23, 2008 with medication for pain management and instructions to follow-up with Dr. Brown in a week.[25] (R. 343-49).

In a letter to Dr. Brown dated January 14, 2009, Dr. Kaufmann reported that he had seen Plaintiff for a follow-up visit that day. Plaintiff reported that the severe, debilitating headaches she was having before the surgery had completely resolved. She continued, however, to get the migraine headaches she had been having for 30 years. The

---

[25] Two days following her discharge from the hospital, Plaintiff presented to the Emergency Department of UPMC Mercy Hospital with complaints of fever, headache and nausea. Plaintiff's diagnosis was post-surgical headache pain. She was treated and discharged in stable condition. (R. 350-51).

numbness and tingling in Plaintiff's upper extremities were also resolved by the surgery. Plaintiff reported that "for the most part," she was able to perform all daily activities and had stopped taking pain medication. Dr. Kaufman prescribed a course of physical therapy ("PT") to improve the range of motion in Plaintiff's neck. Plaintiff informed Dr. Kaufmann that she was applying for disability benefits and needed papers filled out. Due to his unfamiliarity with disability qualification, Dr. Kaufmann indicated that he was referring Plaintiff for a functional capacity evaluation ("FCE"). (R. 355-56).

Plaintiff's FCE was performed at Valley Outpatient Rehabilitation on January 27, 2009. The evaluator concluded that Plaintiff was capable of sustaining work at the light level on a full-time basis, i.e., 8 hours a day/5 days a week.[26] (R. 376-79).

Plaintiff was seen by Dr. Brown on February 5, 2009 to follow-up on her recent surgery. Dr. Brown noted that 3 months had passed since Plaintiff's surgery to correct the Chiari malformation, and that she was "recovering nicely." Plaintiff reported that the constant numbness in her upper extremities was much better; her migraine headaches had returned to their previous level of severity; but she had daily severe myofascial

---

[26] Neither the identity nor the qualifications of the evaluator appear on the report of Plaintiff's FCE. (R. 376-79).

pain from the fibromyalgia. Dr. Brown indicated that he wanted Plaintiff to be evaluated by a rheumatologist. (R. 364).

During Plaintiff's next follow-up visit with Dr. Kaufmann on February 25, 2009, Plaintiff continued to deny weakness, numbness or paresthesias in her upper or lower extremities or problems with gait or balance. Plaintiff did, however, have an incident earlier that week during which her level of consciousness was altered spontaneously; specifically, she experienced some alternating eye movements, failed to respond to stimuli and her hands trembled. Plaintiff could not recall the incident which had been witnessed by her fiancé. Dr. Kaufmann did not believe that Plaintiff's recent incident and continuing migraine headaches were related to the Chiari malformation or the corrective surgery, and he recommended evaluation by a neurologist. With regard to Plaintiff's application for disability benefits, Dr. Kaufmann stated: "... it does seem that from the number of different problems that she has that she would have difficulty with full time physically strenuous work." From a surgical standpoint, Dr. Kaufman described Plaintiff as stable, indicating that there was no need for any further follow-up appointments. (R. 352-54).

Plaintiff returned to Dr. Brown on March 20, 2009 with complaints of fibromyalgia pain. Plaintiff reported that the pain, which was the worst she could remember, interrupted her

sleep, precluded her from reaching her arms up to fix her hair and affected her overall activity level. Dr. Brown noted that Plaintiff was tearful which was "unusual for her." Pain medication was prescribed for Plaintiff. (R. 363).

During a mental health evaluation at FamilyLinks, Inc. on March 31, 2009, Plaintiff reported that "she was struggling with depression, anxiety, anger and thoughts of suicide."[27] Plaintiff also reported that she continued to suffer from migraine headaches, although not to the extent that she had before the surgery the previous November to correct the Chiari malformation, and that her panic attacks had returned making it difficult for her to be around people. Plaintiff expressed a desire to be evaluated by a psychiatrist to get back on medication. (R. 360-61).

On July 9, 2009, Plaintiff was seen by Dr. Brown for a check-up. Plaintiff indicated that her headaches were "mostly stable," but she complained of diffuse myalgias secondary to fibromyalgia and recent numbness in her upper and lower extremities. Plaintiff reported that she was seeing a therapist on a regular basis, and she was awaiting an appointment with a psychiatrist. Dr. Brown indicated that Plaintiff would be referred to a neurosurgeon for her sensory symptoms. (R. 408).

---

[27] Specifically, Plaintiff reported suicidal thoughts when her pain became extreme. (R. 361).

On July 29, 2009, Plaintiff was evaluated by Dr. Mary Ann Eppinger, a staff psychiatrist at FamilyLinks, Inc. Plaintiff reported mood swings since she was a teenager and anxiety and depression for 6 years. Plaintiff's symptoms included irritability, decreased energy, interrupted sleep and poor concentration, and she expressed the desire for medication that stabilized her mood but did not make her a "zombie." With regard to Plaintiff's mental status examination, Dr. Eppinger noted that Plaintiff was well groomed; her motor behavior, speech, affect, mood, attention span and appetite were normal; her thoughts were logical; she maintained eye contact and was cooperative; her impulse control and intelligence were average; her level of anxiety was low; she denied hallucinations or suicidal/homicidal potential; her judgment and insight were fair; she was oriented to time, place and person; her recent and remote memory were intact; she recently had been using marijuana on a daily basis for pain control; and her motivation for treatment was good. Dr. Eppinger rated Plaintiff's score on the GAF scale a 55, and her treatment recommendations were medication and outpatient therapy. (R. 380-83).

During a follow-up visit with Dr. Brown on August 29, 2009, Plaintiff was "really upset and discouraged" about the severity of her pain, noting that it was much worse than it had been a couple of years ago. Plaintiff reported that since the surgery

to correct the Chiari malformation, her fibromyalgia symptoms had become more prominent. Dr. Brown noted that Plaintiff had tried a lot of medications to control her fibromyalgia without success. Dr. Brown also noted that Plaintiff was on a high dose of Topamax to prevent migraine headaches; she has bipolar disorder; there was "certainly no substance abuse;" and Plaintiff was a reliable patient. Dr. Brown indicated that a pain management evaluation would be ordered for Plaintiff. (R. 407).

In connection with an office visit on November 3, 2009, Dr. Brown noted that Plaintiff presented with a "constellation" of continued neurologic symptoms. Plaintiff complained of numbness in her hands and feet, arm weakness, occasional spots in her vision, a reduction in tears, and constant head pain radiating into her shoulders, upper arms and neck. Dr. Brown noted that Plaintiff was "fairly distressed;" she had been taking hydrocodone (an opiate (narcotic) analgesic) with "essentially no relief;" she was trying to stay active and be productive; but she could not do anything on a consistent basis. Dr. Brown recommended an eye examination and prescribed Dilaudid for Plaintiff to take until her upcoming pain management evaluation.[28] (R. 406).

---

[28] Dilaudid is a strong analgesic (painkiller) which can be habit-forming. www.nlm.nih.gov/medlineplus/druginfo.

On November 6, 2009, Plaintiff was evaluated for pain management by Dr. Zheng Wang at the Jefferson Pain and Rehabilitation Center. Plaintiff reported chronic pain in the neck, shoulders, hips, elbows and knees, and a medical history of fibromyalgia, RA and Chiari malformation. On a scale of 0 (no pain) to 10 (excruciating pain), Plaintiff rated her pain level a 10 at that time. Plaintiff reported that her sitting, standing and walking tolerances were moderately compromised due to joint pain. Plaintiff's physical examination revealed a mildly reduced ROM in her cervical spine; increasing pain in her neck with cervical ROM; tenderness over her well-healed surgical neck scar; tenderness and spasm in her bilateral cervical paraspinal muscles; normal bilateral shoulder ROM; normal sensation and motor strength in both upper extremities; some rheumatoid nodules in her left wrist; normal lumbar ROM and negative straight leg test; good bilateral hip ROM and stability; normal sensation and motor strength in both lower extremities; and normal deep tendon reflexes in her upper and lower extremities.  Dr. Wang's impression included: 1. Chronic neck pain status post cervical surgery for Chiari deformity, 2. Fibromyalgia, and 3. RA involving shoulder, elbow, hip and knee joints.  Plaintiff signed a narcotic contract with the facility and provided a urine sample for a toxicology screen.  If the screen was negative, Dr. Wang indicated that he would prescribe

Opana for pain control and Vicodin extra strength for breakthrough pain.[29] In addition, he prescribed Mobic for Plaintiff's arthritis.[30] Finally, Dr. Wang recommended that Plaintiff see a rheumatologist for Enbrel injections for her joint pain.[31] (R. 402-03).

The impression of an MRI of Plaintiff's cervical spine on November 15, 2009 was described as follows:

1. No cord lesion or area of abnormal enhancement.
2. Postoperative changes of Chiari decompression.
3. Focal sclerosis of the T1 vertebral body is suggested and of indeterminate etiology. Clinical correlation with follow-up bone scan is recommended.

(R. 409).

Based on a referral by Dr. Brown, Plaintiff was evaluated by Dr. Edward Mistler, a neurologist, on December 4, 2009 for left-sided weakness and numbness of 3 months' duration. With regard to Plaintiff's physical examination, Dr. Mistler noted that she was awake, alert and oriented; her speech was clear and fluent; her memory, concentration and fund of knowledge were

---

[29] Opana is used to relieve moderate to severe pain and may be habit-forming. It is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the body responds to pain. Vicodin, or hydrocodone, is available only in combination with other ingredients, and different combination products are prescribed for different uses. Some hydrocodone products are used to relieve moderate to severe pain. Hydrocodone also is an opiate (narcotic) analgesics. www.nlm.nih.gov/medlineplus/druginfo.

[30] Mobic is used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis (caused by a breakdown of the lining of the joints) and RA (caused by swelling of the lining of the joints). www.nlm.nih.gov/medlineplus/druginfo.

[31] Enbrel is used alone or with other medications to relieve the symptoms of certain autoimmune disorders, including RA. www.nlm.nih.gov/medlineplus/druginfo.

good; her cranial nerves were intact; her motor strength in the upper and lower extremities was "fairly good;" she had giveaway weakness of the shoulders and left thigh; her hand rolling and finger tapping were normal; she had good finger-to-nose testing; her sensation was completely absent on the left side of her body to pinprick and vibration; her reflexes were symmetric; her toes were downgoing; and her gait was odd. Dr. Mistler described his impression as numbness and weakness on the left side of Plaintiff's body of unknown etiology. Dr. Mistler indicated that he was going to review Plaintiff's recent MRIs of the brain and cervical spine, as well as the MRIs performed prior to and following Plaintiff's neck surgery by Dr. Kaufmann, and he was going to check an EMG/nerve conduction study to look for nerve damage. (R. 405).

On March 10, 2010, Plaintiff returned to Dr. Kaufmann. Plaintiff reported that she had been doing reasonably well after her neck surgery in November 2008 until the previous November when she experienced numbness on both sides of her face and the left side of her body; a neurologist advised her to go to the Emergency Room of Jefferson Hospital where she was admitted for several days; an MRI of her brain did not reveal any abnormalities; the neurologist rendered the opinion that Plaintiff was suffering from complex migraine headaches; a few days after her discharge from the hospital, her numbness

improved significantly; the severity of her headaches, however, worsened and she developed some left-sided weakness for which PT was prescribed; and several weeks before this office visit, she developed numbness and tingling in her right hand and foot. Dr. Kaufmann's physical examination of Plaintiff showed that she was alert and appeared comfortable. Plaintiff's incision was well-healed, and her cranial nerves were intact. Plaintiff's motor testing revealed full 5/5 strength in all muscle groups of the upper and lower extremities, although Plaintiff appeared to have some breakaway weakness on the left side (4+ to 5-/5). Plaintiff's sensation to light touch on the right side was intact, but she had patchy areas of numbness on the left side. Plaintiff was independently ambulatory with a normal gait. Dr. Kaufmann ordered an MRI of Plaintiff's brain and cervical spine. (R. 392-93).

The impression of the MRIs of Plaintiff's brain and cervical spine, which were performed on March 31, 2010, were described as follows:

Brain MRI

SATISFACTORY DECOMPRESSION OF THE PATIENT'S KNOWN ARNOLD-CHIARI'S. NO EVIDENCE OF ANY RESIDUAL COMPRESSION IDENTIFIED. NO OTHER SIGNIFICANT ABNORMALITY NOTED.

Cervical MRI

POSTOPERATIVE CHANGES AT THE LEVEL OF THE FORAMEN MAGNUM WITH SATISFACTORY DECOMPRESSION OF THE PATIENT PRIOR TO

CHIARI MALFORMATION.  NO EVIDENCE OF ANY OBVIOUS STENOSIS
OR DISC HERNIATION.  UNREMARKABLE SOFT TISSUES.

(R. 388-91).

Plaintiff returned to Dr. Kaufmann on April 14, 2010.
Plaintiff reported that she continued to have severe headaches
which she described as consistent with her history of migraine
headaches.  Plaintiff did not report any new weakness or
numbness, but she continued to complain of the numbness she had
at the time of her prior visit.  Dr. Kaufmann noted that
Plaintiff's MRIs looked "quite good from a surgical point of
view, with no evidence of any recurrence of the Chiari
malformation...."  Dr. Kaufmann agreed with the opinion of
Plaintiff's neurologist that her symptoms were most consistent
with complex migraine headaches.  Dr. Kaufman did not feel that
Plaintiff would benefit from further surgery and that the best
course of action was to have Plaintiff follow-up with her
neurologist.  (R. 386-87).

Plaintiff was seen by Dr. Brown on June 11, 2010 for
complaints of migraine headaches occurring 3 to 4 times a month,
fatigue and constipation.  Plaintiff reported that her migraine
headaches had worsened since she changed to the generic version
of Topamax.  Dr. Brown's impression included worsening migraine
headaches, chronic numbness and weakness in the upper and lower
extremities and opiate-induced constipation.  (R. 404).

On June 18, 2010, Plaintiff was seen by Dr. Wang for continued complaints of neck, bilateral shoulder and thoracic pain. She rated her pain that day a 7 and indicated the pain was constant. Plaintiff reported that the medications and injections enabled her to be more active, and that her sitting, standing and walking tolerances had increased to 60 minutes, 30 minutes and 30 minutes, respectively. Noting that Plaintiff was making progress, Dr. Wang administered facet injections at the levels of bilateral C6 and a trigger point injection in the thoracic spine. Plaintiff tolerated the injections well and she was instructed to return in 4 weeks. (R. 400-01). During her next visit with Dr. Wang on July 16, 2010, Plaintiff continued to complain of constant neck, thoracic and low back pain, rating her pain level a 7. (R. 398-99).

On October 22, 2010, Dr. Brown completed a Medical Statement Regarding Social Security Disability Claim in connection with Plaintiff's application for SSI. Dr. Brown identified Plaintiff's diagnoses as migraine headaches and fibromyalgia noting that she suffers from numbness and weakness in her upper and lower extremities. He also noted her history of depression. Dr. Brown indicated that Plaintiff's treatment included pain management by injections, PT, opiate analgesics, anti-inflammatory medications and muscle relaxants, Topamax for prevention of migraine headaches and Maxalt for acute migraine

headache attacks. As to work capacity, Dr. Brown rendered the opinion that Plaintiff had none. (R. 394).

In a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities completed the same day, Dr. Brown rendered the following opinions: (1) Plaintiff had no ability to lift and carry objects; (2) Plaintiff could stand/walk less than 2 hours in an 8-hour workday; (3) Plaintiff could sit less than 6 hours in an 8-hour workday; (4) Plaintiff experiences fatigue and requires rest periods during the day; (5) Plaintiff's pain is severe; (6) Plaintiff should never engage in the following postural activities: climbing, balancing, stooping, kneeling, crouching and crawling; (7) Plaintiff's reaching, handling and dexterity were limited; and (8) Plaintiff's environmental restrictions due to her migraine headaches included moving machinery, vibration, temperature extremes, noise, fumes, odor, gases and humidity. Dr. Brown listed the symptoms from Plaintiff's severe pain as appetite disturbance, sleep disturbance and decreased energy. Dr. Brown indicated that Plaintiff had marked restrictions in her activities of daily living; marked difficulty in social functioning; and deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner. Finally, Dr. Brown noted that during acute migraine

headaches, which occurred despite preventative medication, Plaintiff was homebound.  (R. 395-97).

**ALJ'S DECISION**

In order to establish a disability under the Social Security Act, a claimant must demonstrate an inability to engage in any substantial gainful activity due to a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. § 423(d)(1).  A claimant is considered unable to engage in any substantial gainful activity only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ must follow a sequential evaluation process.  See 20 C.F.R. § 416.920(a)(4).  The process was described by the Supreme Court in Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

\*    \*    \*

Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled.  Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  (footnote omitted).

The first two steps involve threshold determinations that
the claimant is not presently working and has an impairment
which is of the required duration and which significantly
limits his ability to work. See 20 C.F.R. §§ 416.920(a)
through (c)(1989). In the third step, the medical evidence
of the claimant's impairment is compared to a list of
impairments presumed severe enough to preclude any gainful
work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt.
A)(1989). If the claimant's impairment matches or is
"equal" to one of the listed impairments, he qualifies for
benefits without further inquiry. § 416.920(d). If the
claimant cannot qualify under the listings, the analysis
proceeds to the fourth and fifth steps. At these steps,
the inquiry is whether the claimant can do his own past
work or any other work that exists in the national economy,
in view of his age, education, and work experience. If the
claimant cannot do his past work or other work, he
qualifies for benefits.

\* \* \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one

through four of the sequential evaluation process for making

disability determinations. At step five, the burden shifts to

the Commissioner to consider "vocational factors" (the

claimant's age, education and past work experience) and

determine whether the claimant is capable of performing other

jobs existing in significant numbers in the national economy in

light of his or her RFC. Ramirez v. Barnhart, 372 F.2d 546,

550-51 (3d Cir.2004).

With respect to ALJ Mills' application of the sequential

evaluation process in the present case, steps one and two were

resolved in Plaintiff's favor: that is, ALJ Mills found that

Plaintiff had not engaged in substantial gainful activity since

April 25, 2007, the date she filed her application for SSI, and the medical evidence established that Plaintiff suffers from the following severe impairments: status-post suboccipital decompressive craniotomy for Chiari malformation, history of headaches due to migraines and Chiari malformation, fibromyalgia, RA of the shoulders, hips, elbows and knees, history of bipolar disorder, anxiety disorder, cannibas abuse and adjustment disorder. (R. 11).

Turning to step three, ALJ Mills found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, Listing 11.08 relating to spinal cord or nerve root lesions, Listing 14.09 relating to inflammatory arthritis, and Listings 12.04, 12.06 and 12.09 relating to affective disorders, anxiety-related disorders and substance addiction disorders, respectively. (R. 11-14).

Before proceeding to step four, ALJ Mills assessed Plaintiff's RFC, concluding she retained the RFC to perform light work with the following limitations: (1) she cannot climb ladders, ropes or scaffolding, (2) she can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, and (3) she cannot work in environments with temperature extremes, vibrations, fumes, dust, odors, pollutants and hazards. In addition, Plaintiff is limited to performing

unskilled, routine, repetitive work, and she is unable to perform rapid production work or work requiring quotas. (R. 14-24).

At step four, in accordance with the VE's testimony, ALJ Mills concluded that Plaintiff was capable of performing her past work as a retail clerk. Thus, Plaintiff had failed to establish that she was disabled and the sequential evaluation process ended without the need to address step five. (R. 17).

**STANDARD OF REVIEW**

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

**DISCUSSION**

Plaintiff challenges ALJ Mills' assessment of her RFC on two grounds. First, Plaintiff asserts the ALJ erred by

rejecting the opinion of Dr. Brown concerning the physical limitations caused by her pain. (Docket No. 11, pp. 5-9). Second, Plaintiff asserts the ALJ erred by finding that her subjective complaints of pain were not entirely credible.[32] (Docket No. 11, pp. 9-12). Based on these alleged errors, Plaintiff seeks reversal of the ALJ's decision, or, alternatively, a remand of the case for further proceedings.

Like the present case, in Lintz v. Astrue, Civil Action No. 08-424, 2009 WL 1310646 (W.D.Pa. May 11, 2009), the claimant's alleged disabling impairments included a diagnosis of fibromyalgia;[33] the claimant's application for disability benefits was denied by the ALJ; and, in the district court, the claimant argued the ALJ's decision should be reversed or, in the alternative, the case remanded for further proceedings because in determining her RFC, the ALJ improperly disregarded the opinion of her treating physician and erred in finding that her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. With regard to the principles applicable to the Court's review of the ALJ's adverse decision in Lintz and the challenge presented when a

---

[32] In this connection, the Court notes that Plaintiff does not address her mental impairments in the brief filed in support of summary judgment. In fact, Plaintiff specifically states that her disability claim "is primarily based on her subjective complaints of pain." (Docket No. 11, p. 12).
[33] The claimant's other alleged disabling impairments in Lintz were degenerative joint disease of the thoracic spine, left calf pain and migraine headaches. 2009 WL 1310646, at *5.

claimant's impairments include a diagnosis of fibromyalgia, the district court stated:

* * *

The Court's assessment of whether the ALJ properly credited the testimony of Plaintiff and the opinions of Plaintiff's treating physicians in determining Plaintiff's residual functional capacity depends on two guiding principles. First, great weight must be given to a claimant's testimony regarding her subjective pain, especially when that testimony is supported by competent medical evidence. Chrupcala v. Heckler, 29 F.2d 1269, 1276 n.10 (3d Cir.1997)("Where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence."). Second, the ALJ is subject to the "Treating Physician Doctrine," whereby the ALJ must accord the reports of treating physicians great weight, especially in instances "where their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.2000)(internal citations omitted). Therefore, reports of a treating physician and the subjective complaints of a Plaintiff cannot be discredited unless contrary medical evidence exists in the record. Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993).

These principles must be applied when the ALJ addressed the weight to be given to the testimony of the Plaintiff and the reports of Plaintiff's treating physicians, especially in a case such as this one that involves a diagnosis of fibromyalgia. "Fibromyalgia syndrome is a common and chronic disorder characterized by widespread muscle pain, fatigue, and multiple tender points.... Tender points are specific places on the body - on the neck, shoulders, back, hips and upper and lower extremities, where people with fibromyalgia feel pain in response to slight pressure." National Institute of Arthritis and Musculoskeletal and Skin Diseases, National Institutes of Health, Questions and Answers About Fibromyalgia, http://www.niams.nih.gov/health info/ fibromyalgia/default.asp (last visited May 5, 2009). "Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community.

The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms. The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis." Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir.2004). In fact, fibromyalgia patients often "manifest normal muscle strength and neurological reactions and have a full range of motion." Rogers v. Commissioner of Social Security, 486 F.3d 234, 244 (6th Cir.2007)(citing Preston v. Secretary of Health and Human Services, 854 F2d 815, 820 (6th Cir.1988). In order to diagnose fibromyalgia, a series of focal points must be tested for tenderness and other conditions must be ruled out through objective medical and clinical trials. Id. at 244. Symptoms associated with fibromyalgia include "pain all over," fatigue, disturbed sleep, stiffness, and tenderness occurring at eleven of eighteen focal points. Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir.1996).

\* \* \*

2009 WL 1310646, at \*7.

See also Perl v. Barnhart, Civil Action No. 03-4580, 2005 WL 579879 (E.D.Pa. Mar. 10, 2005)("This presumption of deference to the testimony of a claimant and the reports of his treating doctors, barring contrary evidence, is particularly significant when the alleged disability concerns a diagnosis of fibromyalgia.").

**Dr. Brown's Opinion of Plaintiff's Physical RFC**

At the time of the hearing before ALJ Mills, Dr. Brown had been Plaintiff's PCP for 17 years, and the administrative record establishes that Dr. Brown treated Plaintiff for fibromyalgia and migraine headaches on a regular basis during the relevant time period. As noted previously, in the medical source

statement completed shortly before the remand hearing, Dr.
Brown, opined, among other things, that due to severe pain from
fibromyalgia and migraine headaches: (1) Plaintiff has no
ability to lift and carry objects, and (2) Plaintiff cannot
stand, walk and sit for a total of 8 hours during an 8-hour
workday. If accepted, the foregoing opinions dictate a finding
that Plaintiff cannot engage in substantial gainful activity
because (a) even sedentary work (the lowest exertion level of
work recognized in the Social Security Regulations) requires an
ability to lift and carry items such as docket files, ledgers
and small tools, and (b) all exertion levels of work require the
ability to work on a "regular and continuing basis" which means
8 hours a day/5 days a week. ALJ Mills, however, determined
that Dr. Brown's assessment of Plaintiff's physical RFC was not
entitled to "significant weight." (R. 19). After
consideration, the Court concludes that ALJ Mills' proffered
reasons for rejecting Dr. Brown's opinion were improper.

i

In a letter to Dr. Brown dated February 25, 2009, Dr.
Kaufmann, the neurosurgeon who performed the surgery to correct
Plaintiff's Chiari malformation in November 2008, stated: "In
terms of her disability application, she is going to discuss the
issue with you, but it does seem that from the number of
different problems that she has that she would have difficulty

with full time physically strenuous work." (R. 353). ALJ

Mills' initial reason for rejecting Dr. Brown's opinion of

Plaintiff's physical RFC is the foregoing statement of Dr.

Kaufmann. According to ALJ Mills, Dr. Brown's "opinion is not

consistent with the finding of Dr. Kaufmann, a specialist in

neurology, that the claimant was unable to do only 'strenuous'

work." (R. 19). While ALJ Mills' interpretation of Dr.

Kaufmann's statement may be reasonable, the precise meaning of

Dr. Kaufmann's statement cannot be determined without further

inquiry. Therefore, ALJ Mills' interpretation of Dr. Kaufmann's

statement constitutes impermissible speculation which cannot

support the rejection of Dr. Brown's opinion of Plaintiff's

physical RFC. See Morales v. Apfel, 225 F.3d 310, 317-18 (3d

Cir.2000), citing, Plummer v. Apfel, 186 F.3d 422, 429 (3d

Cir.1999)("In choosing to reject the treating physician's

assessment, an ALJ may not 'make speculative inferences from

medical reports' and may reject 'a treating physician's opinion

outright only on the basis of contradictory medical evidence'

and not due to his or her own credibility judgments, speculation

or lay opinion.").

**ii**

ALJ Mills also rejected Dr. Brown's opinion of Plaintiff's

physical RFC because it "is not supported by the objective

medical signs and findings set forth in his progress notes and

39

in the records of the claimant's other treating and examining physicians." (R. 19). For the reasons noted by the district court in <u>Lintz</u>, *supra*, it is error for an ALJ to rely on the lack of objective evidence to reject a treating physician's opinion in a disability case involving a diagnosis of fibromyalgia due to the nature of the disease.

According to ALJ Mills, "[t]he only physical findings noted by Dr. Brown were numerous fibromyalgia trigger (sic)[34] points." (R. 19). Contrary to the import of this statement, such findings are one of the two requirements for a diagnosis of fibromyalgia.[35] Moreover, the record contains a diagnosis of this condition by a rheumatologist, the relevant specialist with respect to fibromyalgia. See <u>Sarchet v. Chater</u>, 78 F.3d 305 (7th Cir.1996).[36] Specifically, in March 2005, Dr. Tar diagnosed

---

[34] The overwhelming characteristic of fibromyalgia is long-standing, body-wide pain with defined tender points. Tender points are distinct from trigger points seen in other pain syndromes. Unlike tender points, trigger points can occur in isolation and represent a source of radiating pain, even in the absence of direct pressure. www.nlm.nih.gov/medlineplus/encyc/article/000427.htm.

[35] A diagnosis of fibromyalgia requires a history of at least 3 months of widespread pain, and pain and tenderness in at least 11 of 8 tender-points sites. Sometimes, laboratory and x-ray tests are done to help confirm the diagnosis by ruling out other conditions that may have similar symptoms. www.nlm.nih.gov/medlineplus/ency/article/000427.htm.

[36] In this connection, the Court of Appeals for the Seventh Circuit stated in Sarchet: "The [ALJ]'s opinion contains a substantial number of illogical or erroneous statements that bear materially on her conclusion that Sarchet is not totally disabled. There is first of all a pervasive misunderstanding of the disease. The [ALJ] criticized Sarchet for having consulted a rheumatologist rather than an orthopedist, neurologist, or psychiatrist. Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist." 78 F.3d at 307.

Plaintiff with fibromyalgia based on the presence of tender points in her hips and shoulders.[37] (R. 283-84).

In sum, ALJ Mills erred by failing to address the unique circumstances presented by a claimant alleging disability based on a diagnosis of fibromyalgia. See Aidinovski v. Apfel, 27 F.Supp.2d 1097, 1103 (N.D.Ill.1998)("ALJ Holtz did not acknowledge even once that the disease raises uniquely challenging issues for a disability determination because the objective evidence in a fibromyalgia case generally does not substantiate the patient's potentially severe complaints.").

### iii

ALJ Mills also rejected Dr. Brown's opinion regarding Plaintiff's physical RFC based on the report of the FCE that was performed in January 2009. (R. 376-79). Simply put, the conclusion of an evaluator whose qualifications are unknown that Plaintiff retained the RFC to perform light work following a 2-hour, 45-minute test does not constitute substantial evidence supporting the rejection of the opinion of a 17-year treating physician that is well supported by evidence in the administrative record.

---

[37] The Court notes that another specialist also diagnosed Plaintiff with fibromyalgia. In November 2009, Dr. Wang, who specializes in pain management, diagnosed Plaintiff with fibromyalgia and RA following a physical examination that revealed areas of tenderness and rheumatoid nodules in Plaintiff's left wrist. (R. 402-03).

ALJ Mills also rejected Dr. Brown's opinion that Plaintiff has difficulty with reaching, handling and dexterity because it allegedly is not supported by objective findings. Again, due to the nature of fibromyalgia, the lack of objective evidence to support this opinion is to be expected. In any event, the record does contain evidence of complaints by Plaintiff and findings by her treating physicians which support this opinion. For example, on March 20, 2009, Plaintiff informed Dr. Brown during an office visit that her fibromyalgia pain was the worst she could remember and precluded her from reaching her arms up to fix her hair (R. 363); on July 9, 2009, Plaintiff complained of numbness in her upper extremities during an office visit with Dr. Brown (R. 408); during an office visit with Dr. Brown on November 3, 2009, Plaintiff complained of numbness in her hands, arm weakness, and constant head pain radiating into her shoulders and upper arms (R. 406); during her evaluation by Dr. Wang for pain management on November 6, 2009, Plaintiff reported chronic pain in her shoulders and elbows, among other areas, and Dr. Wang diagnosed Plaintiff with fibromyalgia and RA involving her shoulders and elbows (R. 402-03); during her evaluation by Dr. Mistler, a neurologist, on December 4, 2009, Plaintiff reported left-sided numbness and weakness of 3 months' duration and her physical examination revealed giveaway weakness in the

shoulders (R. 405); Dr. Kaufmann's examination of Plaintiff on March 10, 2010, revealed some breakaway weakness and patchy areas of numbness on the left side (R. 392-93); during an office visit with Dr. Kaufmann on April 14, 2010, Plaintiff continued to complain of numbness in her upper and lower extremities (R. 386-87); and, following his examination of Plaintiff on June 11, 2010, Dr. Brown's impressions included chronic numbness and weakness in the upper extremities (R. 404).

**v**

Finally, ALJ Mills stated "the objective findings do not indicate that the claimant has a condition that is causing severe pain that requires her to be homebound despite medications, as alleged by Dr. Brown." (R. 19). This statement refers to Dr. Brown's notation in the medical source statement that Plaintiff suffers from intermittent migraine headaches, and that, during acute episodes, she is homebound despite preventative medication. (R. 395).

A migraine is a very painful type of headache. People who get migraines often describe the pain as pulsing or throbbing in one area of the head. During migraines, people are very sensitive to light and sound. They may also become nauseated and vomit. www.nlm.nih.gov/medlineplus/migraine.html.

Plaintiff has a well-documented, longstanding history of migraine headaches. She has been prescribed Topamax for years

43

to prevent migraine headaches and Maxalt to take when she gets

an acute migraine headache, despite taking the preventative

medication. In light of the symptoms of migraine headaches,

there is nothing suspect about Dr. Brown's observation that

Plaintiff is homebound during acute episodes of migraine

headaches.[38] He merely noted Plaintiff's history of migraine

headaches as another factor affecting her ability to work on a

full-time basis.

**ALJ Mills' Credibility Determination**

i

Pain itself may constitute a disabling impairment, and a

claimant's complaints of pain must be seriously considered, even

where not fully supported by objective evidence. Smith v.

Califano, 637 F.2d 968, 972 (3d Cir.1981). ALJ Mills concluded

that Plaintiff's subjective complaints were not entirely

credible due to the lack of objective findings to support the

degree of pain alleged by Plaintiff. As noted with regard to

ALJ Mills' improper rejection of Dr. Brown's opinion of

Plaintiff's RFC, lack of objective evidence to support a

claimant's subjective complaints of pain is not a legitimate

---

[38] The Court also notes that Dr. Brown's notation in this regard is consistent with Plaintiff's testimony during the remand hearing. Specifically, when asked to describe her medical problems, Plaintiff stated: "I still have tremendous migraines, sometimes twice a week that put me down for the entire day." (R. 74). Further, there is evidence that Plaintiff has been hospitalized for control of the pain from her migraine headaches. (R. 285-95).

44

basis for an adverse credibility determination in a case involving a diagnosis of fibromyalgia. Plaintiff has been consistently diagnosed by treating physicians with fibromyalgia based on her description of the pain and the presence of tender points, including diagnosis by a rheumatologist who is a specialist in the disease. Therefore, ALJ Mills' first proffered reason for his adverse credibility determination does not constitute substantial evidence supporting such determination.

ii

ALJ Mills also found that evidence of normal grip testing and normal strength testing of Plaintiff's upper and lower extremities during physical examinations undermined her allegations of extremity numbness and weakness. (R. 23). The Court disagrees. First, the Court notes that numbness and tingling are symptoms of fibromyalgia. www.nlm.nih.gov/ medlineplus/ency/article/000427.htm. Second, during her physical examination by Dr. Mistler, a neurologist, on December 4, 2009, Plaintiff exhibited giveaway weakness in her shoulders and left thigh and her sensation was completely absent on the left side of her body to pinprick and vibration. (R. 405). Third, decreased muscle strength is not a symptom of fibromyalgia. See Preston v. Sec'y of Health and Human Services, 854 F.2d 815, 820 (6th Cir.1988)("As noted in the

45

medical journal articles in the record, [fibromyalgia] patients

manifest normal muscle strength and neurological reactions and

have a full range of motion".).

### iii

ALJ Mills' adverse credibility determination also was based

on his observation that Plaintiff reported migraine headaches

and fibromyalgia pain during an office visit with Dr. Brown in

December 2005, but did not seek treatment from Dr. Brown after

that visit until March 27, 2007. While this observation is

supported by the record, ALJ Mills fails to mention Dr. Brown's

notation during the March 27, 2007 office visit that Plaintiff

had lost her health insurance a year before this office visit.[39]

SSR 96-7p specifically states that an ALJ must consider any

explanation offered by a claimant for failure to seek treatment.

Accordingly, Plaintiff's lack of treatment with Dr. Brown

between December 2005 and March 2007 does not constitute

substantial evidence supporting ALJ Mills' adverse credibility

determination.

### iv

With regard to Dr. Brown's treatment records, ALJ Mills

also noted the following in support of his adverse credibility

determination: (1) Plaintiff was reported to be "well-appearing"

---

[39] In fact, during this office visit, Dr. Brown completed a PA DPW "Health-Sustaining Medication Assessment Form" for Plaintiff so she could obtain assistance with regard to the cost of her medications. (R. 309).

during an office visit in June 2007; (2) on September 14, 2007,
Plaintiff told Dr. Brown her migraine headaches were stable; and
(3) Dr. Brown noted in connection with an office visit on
October 9, 2008, that Plaintiff's migraine headaches were
controlled with a high dose of Topamax. While these records of
Dr. Brown do indeed contain these notations, ALJ Mills
erroneously failed to acknowledge numerous other records of Dr.
Brown that do not support his adverse credibility determination.
See Garfield v. Schweiker, 732 F.2d 605 (7th Cir.1983)(While it
is often impracticable and fruitless for every document in claim
for social security disability benefits to be discussed
separately, ALJ may not select only evidence that favors his
ultimate conclusion; his written decision should contain, and
his ultimate determination be based upon, all of the relevant
evidence in the record).

     For example, on May 29, 2007, Plaintiff requested an
increase in her dosage of Topamax from Dr. Brown because she
continued to have migraine headaches, although not as severe as
previously (R. 306); during an office visit on July 23, 2007,
Plaintiff reported pain in her arms and legs and migraine
headaches once or twice a week which required her to retreat to
her room, and Dr. Brown increased Plaintiff's dosage of Topamax
and referred her for a rheumatology consult (R. 304); during an
office visit on January 15, 2008, Plaintiff informed Dr. Brown

47

that her migraine headaches had increased the last 2 months to 1 or 2 a week and her dosage of Topamax was increased again (R. 373); during an office visit on April 18, 2008, Plaintiff reported a loss of feeling and weakness in her hands for a month which was causing her to drop objects and Dr. Brown ordered diagnostic tests (R. 371); during an office visit on June 6, 2008, Plaintiff complained of numbness in her legs and feet, as well as excessive sleepiness, and Dr. Brown ordered an MRI of Plaintiff's cervical spine (R. 366); during an office visit on February 5, 2009 following the surgery to correct her Chiari malformation, Plaintiff reported that her headaches had returned to their previous level, but she was suffering from daily severe myofascial pain from her fibromyalgia, and Dr. Brown referred her for another rheumatology consult (R. 364); during an office visit on March 20, 2009, Plaintiff was tearful and continued to complain of severe fibromyalgia pain, including pain in her arms that was preventing her from lifting her arms to fix her hair, and Dr. Brown prescribed Vicodin for Plaintiff (R. 363); although Plaintiff described her migraine headaches as "mostly stable" during an office visit on July 9, 2009, she complained of diffuse myalgias secondary to fibromyalgia (R. 408); during an office visit on August 29, 2009, Plaintiff was "really upset and discouraged" about the severity of her pain, and Dr. Brown noted that Plaintiff, who he described as a "reliable patient,"

had tried a lot of medications to control her pain without success (R. 407); during an office visit on November 3, 2009, Dr. Brown noted that Plaintiff, who he described as "fairly distressed," presented with a "constellation" of continued neurologic symptoms, including numbness in her hands and feet, arm weakness, and constant head pain radiating into her shoulders, uppers arms and neck (R. 406); and following an office visit on June 11, 2010, Dr. Brown's impressions of Plaintiff included worsening migraine headaches and chronic numbness and weakness in her upper and lower extremities (R. 404).

**v**

ALJ Mills also found that Plaintiff's failure to show up for three scheduled consultative psychological examinations undermines her credibility.[40] While this fact would be relevant in determining whether Plaintiff's mental disorders were disabling, it has little bearing on a case that is based primarily on pain from well-documented diagnoses of fibromyalgia and migraine headaches.

---

[40] In his decision, ALJ Mills also states: "... the claimant was not evaluated by State Agency medical or psychological consultants as she failed to cooperate in attending necessary examinations, and it was determined that there was insufficient evidence to evaluate her limitations." (R. 25). The Court's careful review of the record discloses no evidence to support ALJ Mills' assertion that Plaintiff failed to show for a consultative physical disability evaluation. The "no show" evidence in the administrative record is limited to consultative psychological disability evaluations. On remand, a consultative physical disability evaluation should be scheduled for Plaintiff.

ALJ Mills also found that Plaintiff's credibility is "somewhat" undermined by her inconsistent statements regarding illicit drug use. With regard to the hospital record dated December 29, 2003, Plaintiff reported the use of cocaine and marijuana; she denied any significant drug problem, however. (R. 336). Contrary to ALJ Mills' characterization of these statements, they are not necessarily inconsistent. Plaintiff's statements may be interpreted as meaning that she occasionally used cocaine and marijuana, and she may not consider such occasional use a "significant" drug problem.

As to Plaintiff's statement during a psychiatric evaluation on July 29, 2009 that she had quit smoking marijuana for pain control 6½ weeks before the evaluation (R. 381), and her testimony during the remand hearing on October 27, 2010 that since becoming a born again Christian three years before the hearing she did not smoke marijuana "at all anymore" (R. 75), the Court agrees the statement and testimony are inconsistent. However, this one inconsistency regarding marijuana use does not constitute substantial evidence undermining Plaintiff's credibility regarding her complaints of pain when the record is considered in its entirety.

With respect to ALJ Mills' adverse credibility determination, the Court also notes his failure to address two types of evidence that should have been discussed.[41]  First, although ALJ Mills summarized Plaintiff's testimony during the hearing regarding her activities of daily living (R. 22), he failed to mention this testimony in analyzing the credibility of Plaintiff's subjective complaints of pain.  This failure is significant because it is well established that "sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity," Fargnoli v. Massanari, 247 F.3d, 34, 40 (3d Cir.2001), and Plaintiff's testimony concerning very limited daily activities was uncontroverted.[42]

---

[41] In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, the Social Security Regulations describe the kinds of evidence that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements, which includes the following:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

[42] As noted previously, Plaintiff testified that she does not need assistance with personal hygiene; she can only do prep work for meals; she may fold a

See also Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir.2001) ("The fact that a claimant is able to engage in limited daily activities, such as washing dishes, doing laundry, and cooking meals does not necessarily demonstrate that she is not disabled."); Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981)(Having a disability does not mean that "a claimant must vegetate in a dark room excluded from all forms of human and social activities."); Biri v. Apfel, 4 F.Supp.2d 1276 (D.Kan.1998)("Defense counsel has made reference to plaintiff's social activities. Counsel also notes that plaintiff has shopped for groceries, cared for a grandson, and taken a boat ride. These activities, viewed in context, are not of such frequency and consistency that they offer substantial support for the ALJ's conclusions in this case.").

Second, ALJ Mills failed to address the many types of treatment modalities Plaintiff has pursued in an attempt to control the pain from her fibromyalgia and migraine headaches which supports the credibility of her subjective allegations. See Kelley v. Callahan, 133 F.3d 583 (8th Cir.1998)("Although a claimant's allegations of disabling pain may also be discredited by evidence that the claimant has received minimum medical

---

basket of laundry, but could not fold two baskets the same day; she is able to do "a little bit of dusting," but cannot vacuum; she goes grocery shopping with her fiancé every other week; she limits her driving to very short distances; she sits with her fiancé while he fishes but she cannot cast a rod; and she attends 45-minute services on Sundays with her fiancé. (R. 62, 84, 86-87).

treatment and/or has taken only occasional pain medications, such is not the case with Kelley.... Again, the record shows numerous visits to doctors. She testified that she takes many prescription medications. She has availed herself of many pain treatment modalities, including a TENS unit, physical therapy, trigger point injections of cortisone, chiropractic treatments, and nerve blocks. In addition, she has had several surgeries and many diagnostic tests, including X-rays, CT scans, DNA tests, MRIs, and blood tests); Ward v. Apfel, 65 F.Supp.2d 1208 (D.Kan.1999) ("Plaintiff's desire to seek relief from her pain corroborates her complaints. Plaintiff is taking Lortabs, Ambien, Naproxen, Cyclobenzaprine, and Hydrocodone. She uses a theracane to apply pressure to the knots in her back. She has implemented all the doctor's suggestions, including resting at work, getting a new chair, and rearranging files and her computer. Plaintiff speaks with her doctor once a month, and sets up appointments on an as needed basis when her condition changes.").

As noted in Dr. Brown's medical source statement, Plaintiff takes opiate analgesics, anti-inflammatory medications and muscle relaxants; she has participated in PT; she is treated by a pain management specialist with injections; and she takes Topamax to prevent migraine headaches and Maxalt when, despite the preventative medication, she gets an acute migraine

headache.  The Court also notes the frequency of Plaintiff's treatment by Dr. Brown; his referral of Plaintiff for consults with various specialists; and the many diagnostic tests that have been ordered for Plaintiff.  ALJ Mills erred in failing to discuss the foregoing evidence.

**Step Four Determination**

ALJ Mills ended the sequential evaluation process at step four based on a determination that Plaintiff retained the RFC to perform her past relevant work as a retail clerk.  This determination is flawed.

The ALJ's questions and Plaintiff's responses with respect to her job in the retail clothing store were as follows:

Q.  Okay.  What were you doing in '02?

A.  I think the Deb Store.

Q.  Do you have a recollection of how long you worked there?

A.  Maybe six months.  It was through the holiday season.

Q.  Were you considered a retail clerk?

A.  I wasn't even on the cash register.  I had to stock all the clothing, lift heavy clothing, and put it on the racks. Let people in and out of the dressing room and clean the store and –

Q.  Alright.

A.  – mop the floors.

(R. 67).

Clearly, as described by Plaintiff, her job with the retail clothing store was more akin to a stockperson than a retail clerk which may have a significant effect on the classification of the job. On remand, the Commissioner should procure additional VE testimony to reconsider the classification of this job as performed by Plaintiff for purposes of step four of the sequential evaluation process.

**Conclusion**

In sum, on remand, the ALJ should (a) obtain a consultative physical evaluation of Plaintiff; (b) obtain testimony from a VE regarding the proper classification of Plaintiff's job in the retail clothing store as performed by Plaintiff for purposes of step four of the sequential evaluation process; (c) re-evaluate the medical opinions in the administrative record; and (d) re-evaluate the credibility of Plaintiff's allegations of disabling pain utilizing the proper analysis in cases involving a diagnosis of fibromyalgia.


_William L. Standish_
William L. Standish
United States District Judge


Date: August /5, 2012